UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| WILLIAM RICHARD JOHNSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | 2:10-cv-81 |
| ) | |
| ROEHL PROPERTIES OF INDIANA LLC ) | |
| d/b/a ROEHL TRANSPORT, INC., ) | |
| KAREN CLIVER, in her official capacity, ) | |
| LAURA MILLER in her official capacity, ) | |
| and GREG KEPPLE in his official capacity, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

This is an employment discrimination case in which William Johnson alleges that his former employer, Roehl Transport, violated the Family Medical Leave Act, the Americans with Disability Act, and ERISA when it terminated his employment. Roehl says that they let Johnson go in early 2009 because bruising economic conditions had crippled its business. Johnson's principal claim is that Roehls's stated reason for firing him was a front to cover its actual motivation, which was to punish him for taking FMLA leave. The Defendants have now collectively filed a Motion for Summary Judgment, and Johnson has in turn filed his own Motion for Partial Summary Judgment. For the reasons explained in detail below, Defendants' Motion will be granted, Johnson's Motion will be denied, and this case will be dismissed.

## BACKGROUND

Roehl is a trucking company based in Wisconsin that services the eastern half of the United States. It recruits truck drivers throughout its service area. Roehl hired Johnson in 2003 or 2004 to work in its Gary, Indiana office as a fleet manager, a position focused on

communicating with truck drivers about their loads, routes, and any assistance they might need. Johnson remained in that position full-time for about a year and a half until he was called for military duty with the Indiana National Guard in 2005. Johnson requested leave, which Roehl granted. But as it turned out, Johnson's military commitment started daily at noon, so Roehl's management asked Johnson if he would be willing to continue to work at Roehl in the mornings while he was fulfilling his military commitment in the afternoons and early evenings. Johnson agreed, and for two years he worked part time from 7:00 am to 11:30 am daily. Johnson continued to work this schedule until his military assignment ended in January of 2007.

At that point Johnson returned full-time and Roehl changed his position to a Driver Employment Specialist ("DES") – a position responsible for recruiting new truck drivers. Roehl has a centralized Driver Employment Center at its headquarters, from which it directs various DES's (there are currently 11 DES's and three Regional DES's). Johnson was hired as a DES in part because Roehl had decided to start a new recruiting program – the "Honor Program" – focused on recruiting military personnel to be truck drivers. As Roehl describes it, the Honor Program had three parts. First, there was a military recognition program in which Roehl employees who had served in the military would receive a certificate of thanks, a shirt patch, and a decal. Second, Roehl provided free Commercial Drivers License training to members of the military or those who had left the military in the past year. Third, Roehl created a military recruiting apprenticeship program that was certified by the Department of Labor and the Department of Veterans Affairs. This program enabled former military members to get apprenticeship truck driver training while being paid both a salary from Roehl and additional benefits from the government pursuant to the G.I. Bill.

2

Johnson argues that this three-part structure of the Honor Program is actually a disputed issue of fact, arguing that the evidence shows that "the Honor Program and Apprenticeship Program are two separate programs at Roehl." [DE 28 at 7.] But this claim is completely undermined by the deposition testimony to which Johnson cites in support. The testimony he cites comes from Roehl employees with knowledge of the program and actually confirms that the Honor Program had the aforementioned three-part structure. It is true, apparently, that non-military personnel could also enter the apprenticeship program, but the main focus of the program was marketing it to military personnel because it would then also be able to market the additional government benefits coming from the G.I. Bill. [DE 33-2 at 6.]

In any case, even if the structure of the Honor Program were a legitimately disputed fact, it wouldn't qualify as *material* because everyone agrees that Johnson's new position focused to some degree on recruiting military personnel for the apprenticeship program. Johnson testified he spent about one week per month focused on military recruiting for the apprenticeship program. To fill the rest of his work hours, Johnson also did general recruiting (unrelated to the military) in Chicago, part of Indiana, and Michigan. Johnson estimated that, per month, he would spend about a week-and-a-half in the Gary-office, a week out doing recruiting for the apprenticeship part of the Honor Program, and a week-and-a-half recruiting in Indiana and Michigan. [DE 29-1 at 64-5.]

There is a dispute as to whether Johnson was the only Roehl employee doing military recruiting for the apprenticeship program. Johnson's supervisor testified that "he was the only one who was going out and going to military installations" [DE 31-2 at 9.] Johnson testified that two other employees – "Carrie" and "Rob" – were doing the same work that he was: some

3

military recruiting along with general recruiting. [DE 29-1 at 38-45.] Either way, it is undisputed that recruiting for the apprenticeship program was an important piece of Johnson's position.

Problems arose for Roehl and Johnson when, as anyone able to read this Opinion knows, the U.S. economy crashed in the fall of 2008. The trucking business suffered as much as any other, and in late 2008 and early 2009 Roehl looked for ways to cut its overall costs. The military recruiting for the apprenticeship program was one of the first casualties, which made sense because drivers in that program were more expensive than other Roehl drivers: Roehl pays the majority of its drivers by the mile driven, but military personnel recruited through the apprenticeship program had to be paid on a salary basis in order to comply with federal rules. Thus, when the number of trucking loads decreased during the economic crisis, apprenticeship-program drivers still had to be paid their salary, unlike other drivers who would only be paid when they actually had a load to haul. Roehl thus decided to eliminate the apprenticeship program in January of 2009 and that no additional drivers would be hired through that program as of February 1, 2009.

With the apprenticeship program eliminated, Johnson continued to work as a DES responsible for recruiting in Michigan, part of Indiana, and the Chicago area. The Director of the Driver Employment Center testified that about two-thirds of Johnson's time was spent recruiting in Michigan, with the remaining third split among the other areas. [DE 31-3 at 7.] Johnson then learned he needed heart surgery on February 13, 2009. He told his supervisor that he needed leave on February 16, submitted an FMLA application on February 19, and had

successful surgery on February 20. After the surgery he was on FMLA leave and expected to remain on that leave for somewhere between a month and three months.

After Johnson went on FMLA leave, Roehl decided to eliminate its recruiting in Michigan in another attempt to reduce costs. Michigan was targeted for two reasons: first, freight from automobile manufacturers in Michigan dried up and there was very little freight going in and out of Michigan for Roehl; second, Michigan's interesting geography makes it something of a dead end in the trucking industry because trucks cannot pass through Michigan on their way to another state. Consequently, it made it more difficult for drivers to return home to Michigan with full loads, making drivers based in Michigan more costly.

Johnson has tried to raise a dispute about the timing of the elimination of the Michigan program by pointing to the testimony of Wendy Bartz – Johnson's direct supervisor at the Driver Employment Center. Bartz testified that Michigan recruiting was shut down "[a]bout 2009, end of 2008." [DE 33-3 at 12.] It is clear from the testimony that Bartz was estimating as to the timing of the shutdown of Michigan recruiting. But with this testimony, Johnson hopes to raise an inference that the Michigan recruiting may have been shut down before he took his leave.

On the evidence presently before me, however, this is not really a genuinely disputed factual issue. The decision to shut down Michigan was ultimately made by the Cindy Farber, the Director of the Driver Employment Center, who testified far more concretely on the matter during questioning from Johnson's attorney:

> Q: And so when did the decision come down to stop doing presentations in Michigan?
>
> A: That was made some time in February at the end of February.

> Q: So it's fair enough to say that the decision to stop traveling to the Michigan area to make presentations at school was made after Mr. Johnson requested FMLA leave?
>
> A: Yes.
>
> Q: He was actually on FMLA when the decision was made?
>
> A: Correct.

[DE 29-5 at 8-9.] Moreover, Johnson argued in his briefing that he was still working on Michigan recruiting when he discovered his need for surgery. [DE 32 at 5.] It is therefore clear that the decision to eliminate Michigan recruiting occurred only after Johnson requested his FMLA leave.

Johnson's job at Roehl was left in a precarious position once Roehl decided to eliminate both the apprenticeship program and the Michigan recruiting. Because essentially two thirds of his job had been eliminated – i.e., military recruiting and recruiting in Michigan – Roehl ultimately decided to eliminate Johnson's job altogether and absorb the rest of his duties into other positions. Thus, on March 5, 2009, while Johnson was still on FMLA leave, Roehl telephoned him to inform him of the decision. Roehl also sent him a written termination letter dated that same day. After filing a charge of discrimination with the Equal Employment Opportunity Commission and having that charge denied, Johnson initiated this lawsuit.

## ANALYSIS

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248

(1986). In making this determination, a court construes "all facts and reasonable inferences from the record in the light most favorable to [ ] the non-moving party." *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 900 (7th Cir. 2005). In reviewing cross-motions for summary judgment, a court applies this standard to both motions; in other words, it must view all facts and draw all reasonable inferences in a light most favorable to the party against whom the motion is made. *Tate v. Long Term Disability Plan for Salaried Employees of Champion Int'l Corp. # 506*, 545 F.3d 555, 559 (7th Cir. 2008).

There are a couple of house cleaning matters to address before considering Johnson's three claims. First, Johnson's claim under the Age Discrimination in Employment Act has been voluntarily dismissed and need not be discussed further. [DE 26.] Second, although Johnson has named three individual employees of Roehl as defendants in their official capacity, "official-capacity claims against . . . individual defendants" are the same as a plaintiff's "claims against [the individual] defendants' corporate employers." *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010). So the proper defendant here is Roehl and no one else.

The third issue is a bit more distressing. Plaintiff's counsel appears to be well aware of the page limits for briefs established by Northern District of Indiana Local Rule 7-1(e) – as evidenced by the fact that, for each of the three briefs he filed in conjunction with these cross motions for summary judgment, he just barely managed to fit his conclusion on the final page allowed. Unfortunately, this ostensible compliance with page limits is actually just a facade, as it could only be accomplished by violating another local rule: the font size of these briefs was reduced to 11.5-point in the body and 9.5-point in the footnotes. I thus refer counsel to Northern District of Indiana Local Rule 5-4(a)(4) ("Any pleading, motion, brief . . . must . . . use at least

7

12-point type in the body and 10-point type in the footnotes."), urge him to comply with this rule in all future filings with this Court, and caution him that, should his client seek to appeal this ruling, the Seventh Circuit has been notably less forgiving on matters of this sort. *See*, *e.g.*, *Westinghouse Elec. Corp. v. NLRB*, 809 F.2d 419, 424-5 (7th Cir. 1987) (imposing a $1,000 penalty solely on counsel for attempting "to disguise the excess [of briefs] by a variety of typographical techniques" that included smaller type, compacted spacing, and smaller margins).

With this underbrush cleared away I will address Johnson's three claims: 1) that Roehl committed various FMLA violations when it discharged Johnson while he was on FMLA leave; 2) that Roehl violated the ADA when it failed to accommodate Johnson's diabetes and a knee condition; and 3) that Roehl violated ERISA by terminating Johnson in retaliation for claiming various employee benefits.

**I.     FMLA Claim**

There are two types of FMLA claims – those for interference and those for retaliation – and Johnson argues he can successfully bring both in this case. With respect to an interference claim, the FMLA mandates that an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any FMLA rights. 29 U.S.C. § 2615(a)(1). With respect to a retaliation claim, the FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). "The difference between a retaliation and interference theory is that the first requires proof of discriminatory or retaliatory intent while [an interference theory] requires only proof that the employer denied the employee his or her entitlements under the Act." *Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 993 (7th Cir. 2010). Under either

theory, however, an employer does not violate the FMLA for failing to reinstate a plaintiff to his former position if the employee would have been let go even if he had not taken the leave and the termination decision was unrelated to the leave request. *Shaffer v. American Medical Ass'n*, 662 F.3d 439, 443 (7th Cir. 2011).

### A. Interference

To prevail on an FMLA interference claim, a plaintiff must establish that: "(1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled." *Goelzer*, 604 F.3d at 993. Both parties agree that Johnson has established the first four prongs of the interference test; they dispute whether Roehl denied Johnson a benefit to which he was entitled by terminating his employment before he returned from leave.

Roehl has the better of the argument because Johnson has no legitimate interference claim. Johnson can only satisfy the fifth prong in one of two ways – both of which he seems to obliquely raise in his briefing. His first option is to claim that by being fired while on FMLA leave, he was denied the FMLA benefit of being reinstated. Reinstatement is one of the classic rights guaranteed by the FMLA, but it is a right only available to *employees* – and once Johnson was fired, he was no longer an employee and no longer had a right to reinstatement. This is, in fact, exactly one of the situations referenced in the Department of Labor's regulations interpreting the FMLA: "If an employee is laid off during the course of taking FMLA leave and employment is terminated, the employer's responsibility to continue FMLA leave, maintain group health plan benefits and *restore the employee cease at the time the employee is laid off*,

9

provided the employer has no continuing obligations under a collective bargaining agreement or otherwise." 29 C.F.R. § 825.216(a)(1) (emphasis added). Seventh Circuit precedent confirms the point: Roehl "had no obligation to reinstate [plaintiff] because an employer's responsibility to continue FMLA leave and restore an employee 'cease at the time the employee is laid off,' 29 C.F.R. § 825.216(a)(1)." *Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1157 (7th Cir. 1997). Of course, an employer can't fire an employee because he is going to take or has taken FMLA leave – but that's a *retaliation* claim, not an *interference* claim.

The only other alternative for Johnson to shoehorn an interference claim into the facts of this case is to argue that by being fired while on FMLA leave, he was denied a right to remain employed while on his FMLA leave. But in that scenario "the FMLA benefit to which he was entitled" would have to be some sort of right to continual employment while on leave – and the FMLA guarantees no such right. The FMLA does give an employee the right not to be fired simply because he took FMLA leave – but, again, that's a retaliation claim.

Under these circumstances, I agree with other courts that Johnson's claim is really "only a retaliation claim masquerading" as an interference claim. *Dressler v. Community Service Communications, Inc.*, 275 F. Supp. 2d 17, 25 (D. Me. 2003) ("[Plaintiff's] argument that he was 'not restored' because he was taking intermittent leave is really an argument that an adverse employment action (layoff) was imposed on him because he was taking leave. This argument is, inherently, a retaliation argument."). *See also Mascioli v. Arby's Restaurant Group, Inc.*, 610 F. Supp. 2d 419, 433 (W.D. Pa. 2009) (same).

**B.     Retaliation**

10

In making a charge of retaliation under the FMLA, a plaintiff may proceed under either of the two paths – the direct method and the indirect method – that are now ubiquitous in all sorts of employment discrimination cases. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). Although these rote and often inflexible tests are under increasing criticism, *see Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012) and *Good v. University of Chicago Medical Center*, _ F.3d _ , 2012 WL 763091 (7th Cir. 2012), I will adhere to them until told otherwise. For his part, Johnson believes both the direct and indirect paths apply to his case.

      **1.**      **Direct Method**

Under the direct method, Johnson must present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two. *Caskey v. Colgate–Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008). Direct evidence is rare, as it "essentially requires an admission by the decision-maker" that it took actions for unlawful reasons. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). The direct method of proof can also entail presentation of "'a convincing mosaic' of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Silverman v. Board of Educ. of City of Chicago*, 637 F.3d 729, 733–34 (7th Cir. 2011) . But whether one has direct or circumstantial evidence, the focus of the direct method is whether the evidence "points directly to a discriminatory reason for the employer's action." *Id.* at 734, n.3.

Johnson clearly satisfies the first two prongs of the direct method – he engaged in a statutorily protected activity (taking FMLA leave) and he suffered an adverse employment action (being terminated). The trouble comes in satisfying the third element – proving that there was a causal connection between the first two. Johnson admits he has no direct evidence and instead

11

pursues the route of using the "convincing mosaic" of circumstantial evidence. Plaintiffs pursing this route may present any of three broad types of circumstantial evidence. *Id.* at 734. The first type includes evidence of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Id.* The second type is evidence showing that the employer "systematically treated other, similarly situated . . . employees better." *Id.* Finally, the plaintiff may point to evidence that he suffered an adverse employment action and that the employer's justification is pretextual. *Id.* This last type of evidence "is substantially the same as the evidence required to prove discrimination under the indirect method," *id.*, so I'll hold off on addressing the pretext analysis until the next section.

Johnson's first piece of circumstantial evidence is that he was terminated just nine days after his FMLA leave began. He believes this "*exceedingly* short" time frame is suspicious enough to infer a causal link between his FMLA leave and his termination. [DE 32 at 17 (emphasis in original).] But just because something happens after the fact doesn't mean it occurs because of the fact. As the Seventh Circuit has put it, "[t]he mere fact that one event preceded another does nothing to prove that the first event caused the second. Rather, other circumstances must also be present which reasonably suggest that the two events are somehow related to one another." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) (internal citations omitted). And in this case, the "other circumstances" surrounding Johnson's date of termination – namely, the elimination of the apprenticeship program in late January, 2009 and the elimination of recruiting efforts in Michigan after Johnson took his leave – seriously undermine the inference Johnson wants to make about a causal link between his FMLA leave and his

termination. And while "[t]iming may be an important clue to causation, [it] does not eliminate the need to show causation." *Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1179 (7th Cir. 1998). *See also Contretars v. Suncast Corp.*, 237 F.3d 756, 765 (7th Cir. 2001) (temporal proximity by itself does not establish causation); *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P. C.*, 277 F.3d 882, 895 (7th Cir.2001) (plaintiff "needs more than a coincidence of timing to create a reasonable inference of retaliation").

So, without more evidence – and particularly given the timing of the other key events in this case – the nine-day time frame alone is insufficient to create a triable issue. What additional evidence does Johnson provide "to tie the events together"? *Bermudez*, 138 F.3d at 1179. Nothing that is at all persuasive. He argues that Roehl gave him conflicting reasons for his termination, but that's not true. Roehl consistently expressed to Johnson that his termination was due to the elimination of the apprenticeship program and the recruiting efforts in Michigan. Plaintiff admitted that was the explanation provided to him orally when he was terminated. [DE 33-1 at 145.] And it was also the explanation given to him in writing in his termination letter. [DE 33-22.]

Johnson further argues that he was treated differently than similarly-situated employees, but the problem with that argument is that there really is no other similarly-situated employee; Johnson was the *only* employee who handled both the apprenticeship program *and* Michigan recruiting. Johnson argues that there were two other employees handling military recruiting for the apprenticeship program – the mysterious "Carrie" and "Rob" referred to in his deposition and about which he has offered no other evidence. Roehl disputes that anyone else handled military recruiting under the apprenticeship program, but even if Johnson is right about the existence of

13

Carrie and Rob, he presents no evidence (or even so much as alleges) that they also handled Michigan recruiting.

The only real circumstantial evidence Johnson provides that, if true, might have some traction is that Roehl had a pattern of terminating employees who took FMLA. He seems to suggest that, like the plaintiff in the Seventh Circuit's *Caskey* decision, "we infer from these other terminations that [he] was the latest in a string of firings related to" FMLA leave. *Caskey*, 535 F.3d at 594. But, just as in *Caskey*, he provides only a "vague reference to a pattern, without any detail regarding the context of the other terminations, [which] creates too sparse a trail to create circumstantial evidence of a causal connection." *Id.*

In sum, Johnson's claim under the direct method fails because he has "presented no direct evidence of a causal connection for [his] FMLA . . . retaliation claim[], and insufficient circumstantial evidence." *Id.* at 593.

### 2. Indirect Method

Under the indirect method, an employee must establish a *prima facie* case by proving that he (1) engaged in a statutorily protected activity; (2) met his employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Id.* Once the *prima facie* case is established, the burden shifts to the employer to produce a non-discriminatory reason for its action; if the employer meets this burden, the burden shifts back to the employee to demonstrate that the proffered reason is pretextual. *Id*.

Roehl argues that Johnson cannot make out his *prima facie* case and raises some persuasive arguments in that regard – most importantly, that there are no similarly situated

14

employees because, again, Johnson was the *only* employee who handled both the apprenticeship program *and* Michigan recruiting. But the clearest route to seeing the fatal flaws in Johnson's claim is to skip directly to the question of pretext, a path of analysis that the Seventh Circuit has repeatedly held is perfectly permissible when it is case dispositive. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 885 (7th Cir. 2012); *Everroad v. Scott Truck Systems, Inc.*, 604 F.3d 471, 478 (7th Cir. 2010); *Bodenstab v. County of Cook,* 569 F.3d 651, 657 (7th Cir. 2009).

Even construing every inference in Johnson's favor, there is uncontradicted evidence in the record that Roehl had a legitimate non-discriminatory reason to fire him: in the worst economic downturn since the Great Depression, Roehl decided to eliminate the two costly recruiting programs (the apprenticeship program and Michigan recruiting) that were integral to Johnson's position. Having provided this legitimate, non-discriminatory reason, the burden shifts back to Johnson and, "to avoid summary judgment, he must present evidence that the reason proffered by [Roehl] is pretextual." *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005).

Johnson has presented no evidence of pretext. The entirety of his argument is based on the timing of his firing and the purported inconsistency of Roehl's explanations about this firing. *See* DE 28 at 20-21; DE 32 at 18-19; DE 38 at 6-9. But as already explained, the timing makes sense in the overall context, and there is no inconsistency in Roehl's explanation. Moreover, for this whole scheme to be based on a pretext, it would have to be plausible that Roehl eliminated both the apprenticeship program and the Michigan recruiting – and to this day has never restarted either of them – all because it wanted to avoid having Johnson take a leave for a couple months.

Johnson has failed to show that Roehl's stated reason for firing him was a pretext. Accordingly, Roehl is entitled to summary judgment on Johnson's FMLA retaliatory discharge claim.

## II. Johnson's ADA Claim

There are numerous possible causes of action under the ADA, but Johnson limits his allegations to an accommodation claim. *See* DE 32 at 22-23. His argument is convoluted, but it essentially seems to go like this: Roehl knew Johnson had diabetes and a knee replacement when it originally hired him. Roehl then terminated Johnson in March of 2009, and, in Johnson's eyes, subsequently failed to reasonably accommodate his disabilities under the ADA because "Roehl could have provided Johnson accommodation of a cart to perform his job duties" and because "Roehl did not consider other positions for Johnson" or "offer Johnson any other position." [DE 32 at 8.]

These allegations are insufficient to state a cognizable failure to accommodate claim under the ADA. To establish a failure to accommodate claim, Johnson must show that: (1) he is a "qualified individual with a disability"; (2) Roehl was aware of his disability; and (3) Roehl failed to reasonably accommodate his disability. *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005). First, as a threshold matter, Johnson has not provided any evidence that either his diabetes or his knee replacement actually qualify as a disability under the ADA, which requires a showing that at least one of these impairments "substantially limits one or more of [his] major life activities." 42 U.S.C. § 12102(1)(A).

Even assuming he does qualify as disabled, however, Johnson is only asserting that Roehl failed to accommodate him *after* he was terminated. That is, that it failed to accommodate

him by not reinstating him to his prior position or to a new position after he was fired. But once he was fired, he was no longer an employee and had no right to an accommodation. *Clinton v. Runyon*, 2002 WL 1888382, at *5 (N.D. Ill. Aug. 14, 2002) (noting under the analogous Rehabilitation Act that "the reasonable accommodation requirement applies to ongoing employees who need assistance to continue to work, not former employees who wish to be rehired" and that such a claims is really a discrimination claim "not a failure to accommodate claim"); *Beatty v. City of Wheaton*, 1999 WL 91909, at *3 (N.D. Ill. Feb. 11, 1999) ("Because [plaintiff] was a former employee . . . when he requested accommodation, he was not a 'qualified individual with a disability.' Therefore, he does not have a right to relief under § 102 of the ADA.").

What Johnson really seems to be arguing is a sort of *disparate treatment* or *retaliation* claim under the ADA, in which he theorizes that he was fired because Roehl didn't want to have to deal with accommodating his disabilities. But aside from the fact that the theory is completely unarticulated, it also goes nowhere fast since there is absolutely no evidence whatsoever that there is any connection between Johnson's termination and either his diabetes or his knee replacement. Accordingly, Roehl is entitled to summary judgment on Johnson's ADA claim.

### III.    Johnson's ERISA Claim

Finally, Johnson argues that he was terminated based on his eligibility for certain ERISA benefits. Section 510 of ERISA provides in part: "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan." 29 U.S.C. § 1140. To recover under ERISA § 510, Johnson must demonstrate that 1) he is a

17

member of an ERISA plan, 2) he was qualified for the position, and 3) he was discharged under circumstances that provide some basis for believing that Roehl intended to deprive him of benefits. *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 943 (7th Cir. 2007). Under this framework, "plaintiffs must establish more than a loss of benefits; they must demonstrate that their employers terminated them with the specific intent of preventing or retaliating for the use of benefits." *Lindemann v. Mobil Oil Corp.,* 141 F.3d 290, 295 (7th Cir. 1998). In other words, "the plaintiff must ultimately show that a desire to frustrate [the plaintiff's] attainment or enjoyment of benefit rights contributed toward the employer's decision and [the plaintiff] can avoid summary judgment only if the materials properly before the district court, construed sympathetically, allow for such a conclusion." *Teumer v. General Motors Corp.*, 34 F.3d 542, 550 (7th Cir. 1994). There is no cause of action under this section "where the alleged loss of rights is a mere consequence, as opposed to a motivating factor behind the termination." *Lindemann,* 141 F.3d at 295. Moreover, "when attempting to establish intent under section 510 of ERISA, proof of pretext is required." *Id.*

Johnson argues he lost two benefit rights: short-term disability benefits and a car allowance. Other than completely unfounded speculation, however, he sets forth no real evidence whatsoever that would allow for the conclusion that a contributing factor in Roehl's decision to fire Johnson was "a desire to frustrate [his] attainment or enjoyment of [these] benefit rights." *Teumer*, 34 F.3d at 550. It is clear that his loss of these benefits was simply a collateral consequence of his firing. Stated differently, there is absolutely no evidence in the record that would indicate his loss of those benefits was "a motivating factor behind the termination" or that

18

Roehl's explanation for his firing is at all a "pretext" (for all the reasons already explained above). *Lindemann,* 141 F.3d at 296.

Thus, Roehl is entitled to summary judgment on Johnson's ERISA claim.

## CONCLUSION

Even construing all inferences in his favor, Johnson has not raised any issue of material fact that could lead to the conclusion that Roehl fired him because he took FMLA leave, because of his disabilities, or because he was entitled to ERISA benefits. Accordingly, Defendants' Motion for Summary Judgment [DE 30] is **GRANTED**. Plaintiff's Motion for Partial Summary Judgment [DE 27] is **DENIED**. Plaintiff's Motion to Dismiss Count IV [DE 26] is **GRANTED**. The clerk shall **ENTER FINAL JUDGMENT** in favor of Defendants stating that Plaintiff is entitled to no relief. The clerk shall treat this civil action as **TERMINATED**. All pending dates in this case are **VACATED**.

**SO ORDERED.**

ENTERED: April 4, 2012

s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT